UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------

EUGENE TAWIAH,

               Plaintiff,

v.

ETERNITY AUTO CENTER CORP D/B/A BAYSIDE IMPORTS,

               Defendant.

-----------------------------------------------------------------

**COMPLAINT**

**AND JURY DEMAND**

## INTRODUCTION

1. This is an action for actual damages, treble damages, punitive damages, declaratory judgment, attorney's fees and costs brought by consumer Eugene Tawiah, who paid over $32,000 for a used 2011 Mercedes Benz E350 that was represented by the Defendant used auto dealer to be in excellent condition and have no accident history when, in fact, Defendant knew full well that the car had suffered severe and irreparable accident damage, including frame damage, and as a result was completely unsafe to drive and appropriately sold, if at all, only for parts or as scrap metal.

2. As set forth herein, in aid of its scheme, Defendant Eternity Auto center Corp. d/b/a Bayside Imports ("Defendant", "Bayside" or "the Dealership"), knowingly supplied Mr. Tawiah with a redacted and incomplete copy of a Carfax for the vehicle for the sole purpose of misleading him regarding the vehicle's provenance, and reneged on its initial promise to allow him to unwind the transaction after the deception came to light.

3. Specifically, as set forth below, the Dealership violated the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301 *et seq.*, New York General Business Law § 349, New

York General Business Law § 350, New York Uniform Commercial Code § 2-313 (breach of express warranty), New York Uniform Commercial Code § 2-314 (breach of implied warranty of merchantability), and New York Vehicle & Traffic Law § 417. Bayside is also liable to Plaintiff for Breach of Contract and Fraud.

## JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to 15 U.S.C. § 2310(d)(1)(B) and § 2310(d)(3), and pursuant to 28 U.S.C. § 1332.

5. With regard to 28 U.S.C. § 1332, as set forth below, the parties are completely diverse and the amount in controversy exceeds $75,000.00.

6. With regard to 15 U.S.C. § 2310(d)(1)(B) and § 2310(d)(3), as set forth below, the amount in controversy with regard to "all claims to be determined in the suit" is over $50,000.

7. The Court has authority to issue a declaratory judgment pursuant to 28 U.S.C. § 2201 and § 2202.

8. This Court has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

9. Venue in this District is proper under 28 U.S.C § 1391 because a substantial part of the events and omissions complained of took place in this District and Defendant maintains offices, transacts business, and is otherwise found in this district.

## THE PARTIES

10. Plaintiff Eugene Tawiah is and at all relevant times has been a resident of Jersey City, New Jersey.

11. Defendant Eternity Auto Center Corp, doing business as "Bayside Imports", a domestic business corporation under the laws of New York, whose principal place of business is located Bayside, New York, in Queens County.

**FACTS**

12. On January 20, 2014, responding to an advertisement for Mr. Tawiah a 2011 Mercedes-Benz E350 VIN# WDDKJ5GB1BF064998 ("the Vehicle") on cars.com, Mr. Tawiah went to the dealership to discuss the possibility of purchasing the Vehicle.

13. At that time Mr. Tawiah asked the Dealerships sales representative, "Kevin" about the history and physical condition of the Vehicle, seeking to confirm that the Vehicle was in excellent condition and did not have any accident history, and was informed that the Vehicle was in excellent condition, had no accident history, and had "no problems".

14. Relying on the representations of the Dealership, Mr. Tawiah agreed to put a $500 deposit on the Vehicle in order to hold it for him, as he needed to determine if he would be able to arrange a wire transfer of over $31,000 to purchase the Vehicle.

15. Mr. Tawiah and Kevin also agreed that the Dealership would provide Mr. Tawiah with a Carfax report so that he could confirm the Dealership's representation that the Vehicle had a clean, accident-free history.

16. This agreement by the Dealership to document its representations regarding the Vehicle's history was a material component of the agreement between the parties with regard to the purchase of the Vehicle.

17. In the meantime, pending the Dealership's provision of the promised Carfax, Kevin accepted the $500 deposit on behalf of the Dealership and requested that Mr. Tawiah sign a sales contract crediting him for the Deposit.

18. As Mr. Tawiah intended to ship the car for use in his native Ghana, the Dealership agreed to hold the Vehicle pending the completion of the wire transfer and provision of the Carfax, and to then have it delivered to Mr. Tawiah's shipper.

19. Although the sales contract indicates on its face that additional terms are printed on the reverse side, Kevin only provided Mr. Tawiah with a photocopy of the front side of the document.

20. In accordance with an agreement to provide Mr. Tawiah with a Carfax of the Vehicle, on or about January 24, 2014, by text message and fax, "Kevin" sent Mr. Tawiah a copy of what appeared to be the first page of a 5-page Carfax, dated January 24, 2014. The first page indicated that it was a report for VIN# WDDKJ5GB1BF064998 and that no accident/damage had been reported to Carfax.

21. Relying again on the oral representations regarding the Vehicle's condition and history, and on the purported Carfax dated January 24, 2014, Mr. Tawiah authorized the wire transfer of $31,785 to complete the transaction.

22. The funds were received by the dealership on January 28, 2014.

23. On January 29, 2014, concerned that the dealership had only provided 1 page of the 5 page Carfax, Mr. Tawiah obtained a complete Carfax report directly from Carfax.com.

24. The complete report showed that on October 3, 2013 structural damage to the unibody of the Vehicle had been reported by Mercedes-Benz Financial Services in New Jersey.

25. The complete report further indicated that Carfax had been reporting that information since October 7, 2013, well before the purported date of the 1-page from Carfax provided to Mr. Tawiah by the Dealership.

26. Mr. Tawiah, subsequently confirmed this information with an additional report from AutoCheck, which also listed the Vehicle as having frame/unibody damage, and by confirming with Carfax, in writing, that the structural damage was being reported by Carfax at all relevant times

27. Mr. Tawiah promptly contacted the dealership and eventually spoke with a manager named "Ricky."

28. Upon learning of the discrepancies between the 1 page "Carfax" provided by "Kevin" and the complete report, Ricky agreed to cancel the transaction and refund Mr. Tawiah's money.

29. Ricky further promised Mr. Tawiah that the Dealership would refund his money on January 31, 2014.

30. The Dealership failed to honor its agreement, and did not refund Mr. Tawiah's purchase money on January 31, 2014 or at any other time.

31. Moreover, on January 31, 2014, Mr. Tawiah learned that Defendant had delivered the Vehicle to the shipper in Elizabeth, New Jersey.

32. Mr. Tawiah immediately protested in a text to Kevin on January 31, 2014 that this was not what had been agreed upon. After calling the Dealership at least three times to follow up, and repeatedly being put on hold and then disconnected, Mr. Tawiah decided to visit the Dealership in person on Saturday February 1, 2014.

33. That day he spoke with Kevin, who told him that no manager was available due to the Chinese New Year.

34. After several days of following up on the phone, Mr. Tawiah was finally put in touch with a manager named "Jason" who explained that the Dealership would not honor its prior agreement to refund the purchase price and accept the return of the Vehicle.

35. "Ricky" was no longer made available to Mr. Tawiah.

36. On or about February 17, 2014, Mr. Tawiah had the Vehicle returned to the Dealership as it should not have been delivered to the shipper following his rejection of the Vehicle and the Dealership's agreement to rescind the contract and refund the purchase money.

37. The Dealership, however, refused the Vehicle, contacted the police, and directed the tow company to remove it.

38. After consulting with Mr. Tawiah, the tow company agent brought it back to Mr. Tawiah, who has kept it off the road and under cover since then.

39. Prior to bringing this litigation, by and through counsel, Mr. Tawiah again approached the Dealership seeking to resolve the instant dispute.

40. The Dealership, through counsel, refused to offer Mr. Tawiah any relief of any kind.

41. The Dealership was aware at all relevant times, including when it represented to the contrary, that the Vehicle was not accident free, was in extraordinarily poor condition, suffered significant structural damage, and was not roadable.

42. This damage was apparent to the Dealership, as an expert buyer and seller of Vehicles, upon inspection of the Vehicle.

43. Specifically, inspection of the Vehicle by a third party expert has revealed the following issues, all of which the Dealership knew or should have known of, and which individually and cumulatively, render it impossible that any of the dealership's representations to Mr. Tawiah were made in good faith:

> a. The right front fender has been repaired and repainted. This is evidenced by paint overspray into the engine compartment and tool marked attaching bolts fastening the fender in place;
>
> b. The right front door has been repaired and repainted, evidenced by plastic body filler application, sanding scratches and an imperfection known as "dirt seeds" in the color coat;

6

c. The rocker panel, a structural part of the Vehicle, has been resectioned and the right rear quarter panel has been replaced, requiring resectioning into the trunk, wheel house, rocker panel, door jamb opening "B" Pillar and roof sail panel;

d. The right rear sail panel paint finish suffers from visible imperfections known as "run sag" and "dirt seeds" as well as from sanding scratches in the color coat, all of which are clear evidence that the Vehicle has been re-painted;

e. The tail light was not properly sealed to the panels, allowing water ingress; The fit of the tail light assemblies is uneven. The left protrudes slightly past the quarter panel edge. The right is flush. This is the result of sway and indicates that the Vehicle has suffered severe impact, and in addition, is evidence of un-workmanlike and incomplete repairs;

f. The left side quarter panel is buckled and pops outward directly in line with the left quarter glass opening and molding. This is unrepaired accident damage, indicating that the unibody structure is twisted and out of alignment internally (under all the pretty moldings and shiny paint applied in an attempt to hide the damage from unsuspecting lay purchasers such as Mr. Tawiah);

g. The rear trunk panel has been replaced;

h. The rear bumper has been replaced;

i. Both replacement bumpers have been repainted;

j. The rear trunk panel is so poorly installed that the right side factory welds at the quarter panel and the rear panel trunk opening area are visibly ground down, removing the factory welds, but have been re-welded into position. This repair, in addition to being substandard, is evidence of accident damage, and is likely the result of Vehicle "body twist" (as a result of a collision) that did not allow for proper alignment of the panels;

k. The interior of the trunk reveals an excessive amount of aftermarket body seam sealer present that is raw in color the left side factory sealer is painted over silver;

l. The right quarter outer panel has been replaced. It has been sectioned in at the mid right side sail panel to the roof at the wheel opening body cavity, the trunk floor area and the inner door jamb and opening area right side;

m. The gas tank filler pipes have been replaced, and the new pipes have part identification stickers still present;

n. The inner wheel opening of the body structure is completely marked with numerous, repeated hammer blow witness marks to "pound out" the inner wheel house structure and pull and stretch it back into position. Some of the hammering is visible in the trunk floor and the edge of the outer quarter panel poorly fitting it;

o. The fuel door does not fit flush and does not line up straight with the contour of the Vehicle body;

7

    p. The inside of the wheel house is covered with excessive body seam sealer application. The fit however causes water ingress into the trunk through cuts and punctures in the body panels from the disassembly process and pressurized water from the tire and roadway;

    q. The inner side of the quarter panel is rusting already above the exhaust splash shield, due to improper water proofing and rust coat preventative application, despite the fact that the Vehicle has barely been driven;

    r. The right side crumple zones are stretched and pulled back to align the right door opening to make the quarter panel fit. The welds were again ground off at the factory application points and were sporadically re-welded, although many applications were simply left unwelded;

    s. Plastic body filler, commonly called "Bondo" has been applied heavily in the right inner door jamb area to cover over the non-factory welds used to resection the quarter panel to the door opening; and

    t. The upper door to quarter body line is out of alignment. The rear edge of the door is above the quarter panel edge instead of being flush and even.

44. The severe prior damage and substandard repair described above render the Vehicle completely unsafe to operate on public roadways.

45. As a result of this damage, this rebuilt wrecked Vehicle cannot be depended upon to react as designed in a subsequent severe collision.

46. These problems are, amazingly, however, not the most severe from which the Vehicle suffers.

47. Rather, due to its prior accidents, measurement of the wheel base for correctness of the suspension system reveals that the Vehicle's wheel base is no longer symmetrical.

48. Rather, the right side of the Vehicle is ¼ inch suspension longer than the left side. (It should be noted that when dealing with suspension geometry of a Vehicle, a ¼ inch discrepancy of this kind constitutes a massive discrepancy.)

49. This asymmetry means that the Vehicle goes down the road with the two front wheels and the left rear wheels pointed fairly straight ahead but with the right rear wheel pigeon toed

8

inward, causing the right rear wheel to want to make right turns by itself, and scrubbing the right rear tire's treads sideways across the roadway.

50. Even absent any of the other numerous defects and damages detailed herein, this unsymmetrical condition – the result of severe prior accident damage – standing alone, renders the car entirely unsafe to drive.

51. In addition, the right rear sub-frame to body mount, is broken away and the entire rear suspension platform is loose from the coach work of the Vehicle.

52. This, too, standing alone, renders the Vehicle completely un-safe.

53. Moreover, the Dealership obtained the Vehicle at an auction on or about 10/3/2013, at which time, and in connection with the sale of the Vehicle at auction, the auction disclosed the frame damage to the Dealership and all other potential buyers.

54. Defendant intentionally hid its knowledge of the true condition and history of the Vehicle from Mr. Tawiah, and made representations and omissions with regard to same that it knew to be false.

55. Specifically, the Dealership represented that the Vehicle was in excellent condition, and had no significant damage and no accident history, when it knew all of this to be false.

56. As part and parcel of these misrepresentations, the Dealership provided only the first page of a Carfax to Mr. Tawiah rather than the entire report and, moreover, did not provide a report that the dealership itself had pulled, but rather, provided a single page of a report on the Vehicle ordered by another dealership in Virginia.

57. But for Bayside's misrepresentations, Mr. Tawiah would never have proceeded with the purchase as he had no desire to spend $31,985 on an undriveable piece of scrap metal, or in purchasing such a "Vehicle" at any price.

9

58. Defendant's misconduct as described herein was intentional and demonstrates a high degree of moral culpability. Indeed, Defendant's misconduct as set forth herein involved not only egregious out-of-pocket economic harm, but threatened Mr. Tawiah and his family's physical safety, and potentially his and his families' life.

59. This flagrant, intentional, misconduct transcends mere carelessness and, in the alternative, at a minimum, constitutes willful or wanton negligence or recklessness.

## COUNT I
## NYUCC § 2-313
## (Breach of Express Warranty)

60. Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

61. Bayside is a merchant and seller with respect to the Vehicle.

62. As set forth above, prior to and at the time of the sale of the Vehicle to Mr. Tawiah for $31,985.00, for the purpose of inducing plaintiff to consummate the transaction, as part of the basis of the bargain, Bayside represented and expressly warranted to Mr. Tawiah that the Vehicle was in excellent condition and did not have any significant damage or any accident history.

63. Bayside further warranted that the excellent condition and accident-free history of the Vehicle would be documented by a Carfax report.

64. Its representations to Mr. Tawiah that a Carfax confirming the condition of the Vehicle would be provided, included a written representation by the sales representative that the Carfax would be provided.

65. Bayside breached said express warranties in that the Vehicle is in extremely poor condition, has significant accident history, and suffers from severe damage, including structural/unibody damage, which renders it an unsafe-to-drive, unrepairable, scrap/parts Vehicle.

66. Bayside further breached said express warranties in that no Carfax report was provided, but rather only the first page of a report apparently ordered by another dealership, which included information that the Dealership new at the time to be false.

67. Bayside's misrepresentation of material fact was made in order to, and in fact did, induce Mr. Tawiah to buy the Vehicle.

68. Mr. Tawiah, in agreeing to consummate the transaction, relied upon Bayside's express warranty as to the condition and history of the Vehicle and the provision of a true and complete Carfax documenting same.

69. Mr. Tawiah would not have bought or been interested in buying the Vehicle at any price had he been aware that it had structural damage and an accident history.

70. On January 29, 2014, upon learning of Bayside's breach of warranty, *i.e.* upon determining that the partial Carfax provided to him by Bayside was bogus and incomplete, and learning of the true condition and history from a Carfax he himself ordered, Mr. Tawiah immediately notified Bayside.

71. As a direct result of Defendant's breach of express warranty, Mr. Tawiah has suffered actual damages in an amount exceeding $25,000, including the actual value of the Vehicle as compared with the price paid by Mr. Tawiah, and all costs related to Mr. Tawiah's storage and insuring of the Vehicle, as well as his rebuffed attempts to have the Vehicle returned to Defendant.

72. As a direct result of Defendant's breach of express warranty, Mr. Tawiah is entitled to actual damages, including consequential and incidental damages, and costs.

### COUNT II
### NYUCC § 2-314
### (Implied Warrant of Merchantability)

11

73. Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

74. At all relevant times, Defendant was a retail merchant with respect to the goods sold to Mr. Tawiah.

75. In selling the Vehicle to Mr. Tawiah, Defendant warranted that the Vehicle was of a quality which would at least pass without objection in the trade, was of fair, average quality within the description, and was at least fit for ordinary purposes for which the Vehicle was sold.

76. In purchasing the Vehicle, Mr. Tawiah relied upon Defendant's said warranty of merchantability, as well as upon representations and statements constituting express warranties which were made by Defendant.

77. The Vehicle was not of merchantable quality and was not suitable for ordinary purposes. Indeed, as detailed herein, the Vehicle is completely unsafe to drive, is suitable only to be used as source of parts and scrap metal, and cannot be repaired.

78. Defendant breached the warranty of merchantability which had become part of the basis of the bargain between Mr. Tawiah and Defendant.

79. The Vehicle cannot be put into merchantable quality due to the severe structural and other damage it has suffered.

80. Mr. Tawiah notified Defendant that he wished to rescind the sale and rejected the Vehicle.

81. As set forth above, Defendant has refused to accept the return of the Vehicle and has refused to refund to Mr. Tawiah the purchase price of $31,485 or any other amount.

82. As a direct result of Defendant's breach of the implied warranty of merchantability, Mr. Tawiah has suffered actual damages in an amount exceeding $25,000, including the actual value of the Vehicle as compared with the price paid by Mr. Tawiah, and all costs related to Mr.

Tawiah's storage and insuring of the Vehicle, as well as his rebuffed attempts to have the Vehicle returned to Defendant.

## COUNT III
## NEW YORK VEHICLE & TRAFFIC LAW § 417

83. Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

84. Defendant is a used car dealer subject to the requirements of Vehicle & Traffic Law § 417 ("VTL § 417").

85. VTL § 417 required Defendant to provide Mr. Tawiah with a certification that the Vehicle was in condition and repair to render, under normal use, satisfactory and adequate service upon the public highway at the time of delivery.

86. VTL § 417 further provides that the failure of the vendor to deliver to the vendee the certificate required or delivery of a false certificate knowing the same to be false or misleading or without making an appropriate inspection to determine whether the contents of such certificate are true shall constitute a violation of VTL § 417.

87. Defendant's conduct violated § 417 in that:

   a. Defendant did not provide Mr. Tawiah with the required written certification;

   b. The Vehicle was not in condition and repair to render, under normal use, satisfactory and adequate service upon the public highway at the time of delivery (and, to the contrary, was completely unsafe to operate at the time of sale, as detailed herein);

   c. Given the condition of the Vehicle, it is inconceivable that Defendant performed the inspections required under VTL § 417 (including, but not limited to the inspections required under 15 NYCRR § 79.21 and 15 NYCRR 78.13) or believed in good faith that the Vehicle complied with same; and

      d. By selling the Vehicle, Defendant falsely represented that the Vehicle met the non-waivable, statutory warranty of serviceability created by § 417.

88. Each of the above listed failures to comply with VTL § 417 constitutes an independent violation of the statute.

89. As a result of Defendant's breach of VTL § 417, Mr. Tawiah is entitled to actual damages exceeding $25,000, treble damages exceeding $75,000, costs and attorney's fees.

## COUNT IV
## MAGNUSSON MOSS WARRANTY ACT ("MMWA"), 15 U.S.C. §§ 2301, *et seq*.

90. Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

91. Defendants, collectively, are a "supplier" and/or "warrantor" within the meaning of the MMWA, § 2301(4).

92. Plaintiff is a "consumer," as that term is defined under the MMWA, § 2301(3).

93. The Vehicle sold to Plaintiff is a "consumer product" within the meaning of the MMWA, § 2301(1).

94. There is no dispute resolution mechanism which applies to Plaintiff's warranty dispute.

95. In the alternative, Defendant has no dispute resolution mechanism which is enforceable under the MMWA and, also in the alternative, Plaintiff's good-faith attempts to resolve any dispute with Defendant, which was rebuffed, constitutes compliance with any reasonable dispute resolution requirement.

96. Defendant violated the MMWA and its implementing regulations by breaching the implied and express warranties, as well as the statutory warranty of serviceability created under VTL §417, as set forth above (see Facts and Counts I through III, herein).

14

97. As a result of these violations, pursuant to MMWA § 2310(d), Mr. Tawiah is entitled to actual damages in excess of $25,000, declaratory judgment that Defendant's practices violate the MMWA, and reasonable attorney's fees, costs and expenses.

### COUNT V
### FRAUD

98. Plaintiff re-alleges and incorporates by reference the foregoing paragraphs.

99. As set forth above, Defendant made representations as to material facts regarding the Vehicle. Specifically, Defendant represented that the Vehicle did not have any significant damage, was in excellent condition, and had no accident history, and further represented that these facts would be borne out by a Carfax report.

100. Implicit within that latter representation was that the Carfax report provided by Defendant would be a true, current and complete Carfax, and not an outdated, partial or intentionally altered Carfax report.

101. As set forth in detail herein, these representations were all false.

102. Defendant intended to deceive Mr. Tawiah and was aware at all relevant times that the Vehicle had been in a significant accident and suffered frame damage.

103. Mr. Tawiah believed and justifiably relied upon Defendant's representations and was induced by them to purchase the Vehicle.

104. Had Defendant been truthful and not made these fraudulent misrepresentations, Mr. Tawiah would not have purchased the Vehicle at any price.

105. As a result of such reliance, Mr. Tawiah sustained pecuniary loss in excess of $25,000.

106. Moreover, Defendant's conduct was egregious on every level: not only was Defendant's fraud a virtually larcenous scheme that caused significant economic harm; but Defendant's fraud

15

put Mr. Tawiah and his family's lives at risk, as the Vehicle sold to him was completely unsafe to drive.

107. Indeed, concealment of the Vehicle's accident history and severe, structural damage describe the kind of outrageous conduct that allows recovery of punitive damages.

108. As a result of Plaintiff's reasonable reliance upon Defendant's misrepresentations, Plaintiff is entitled to actual damages in excess of $25,000, punitive damages of not less than an additional $100,000, plus attorney's fees, and costs.

## COUNT VI
## NYGBL § 349 (Deceptive Acts and Practices Unlawful)

109. Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

110. Each of the deceptive acts and practices set forth above constitutes a violations of NYGBL § 349 independent of whether these acts and practices constitute violations of any other law.

111. These deceptive acts and practices were committed in conduct of business, trade, commerce or the furnishing of a service in this state.

112. Each of these actions was consumer oriented and involves misleading conduct that is recurring and has a broad impact upon the public, or, in the alternative, such misleading practices are the types that could easily recur, could potentially impact similarly situated consumers, and are therefore consumer-oriented and harmful to the public at large.

113. Defendant's conduct and statements were materially misleading.

114. As a result of these violations of NYGBL §349, Plaintiff suffered actual damages of over $25,000.

115. Defendant's violations were willful and knowing and committed in bad faith.

116.    For these reasons, Plaintiff is entitled to actual damages in excess of $25,000, three times the actual damages up to $1000, punitive damages of not less than an additional $100,000, attorney's fees, costs and declaratory judgment that Defendant's practices are deceptive in violation of § 349.

## COUNT VII
## NYGBL § 350 (Unlawful False Advertising)

117.    Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

118.    Under NYGBL § 350, "false advertising" means "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity . . . to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual."

119.    Defendant's oral misstatements and omissions regarding the history and condition of the Vehicle constitute false advertising pursuant to NYGBL § 350.

120.    Defendant's oral and written representation that the Vehicle's condition and history would be confirmed by a Carfax report constitutes false advertising pursuant to NYGBL § 350.

121.    Defendant's provision of a partial, outdated, redacted and inaccurate Carfax report to Mr. Tawiah constitutes false advertising pursuant to NYGBL § 350.

122.    Defendants' false advertising was done knowingly and willfully and committed in bad faith.

123. As a result of these violations of NYGBL §350, Plaintiff -- who would not have purchased the Vehicle at any price but for Defendant's false advertising -- suffered actual damages in excess of $25,000.

124. For these reasons, Plaintiff is entitled to injunctive relief (enjoining the false advertising practices described above), actual damages in excess of $25,000, three times the actual damages up to $10,000, punitive damages of not less than $100,000, reasonable attorney's fees and costs.

## COUNT VIII
## Breach of Contract

125. Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

126. Defendant agreed to rescind the transaction and refund Plaintiff $31,985.

127. Defendant breached this agreement, refusing to rescind the transaction and refusing to refund Plaintiff any funds.

128. As a result of Defendant's breach, Mr. Tawiah has been damaged in the amount of more than $25,000.00, and is entitled to actual damages, costs and expenses.

WHEREFORE, Plaintiff respectfully demands judgment against Defendant as follows:

a. On COUNT I, NYUCC § 2-313 (Breach of Express Warranty), judgment against Defendant, actual damages, and costs;

b. On COUNT II, NYUCC § 2-314 (Breach of Implied Warranty of Merchantability), judgment against Defendant, actual damages, and costs;

c. On COUNT III, VTL § 417, judgment against Defendant, actual damages, including consequential and incidental damages, treble damages, costs and attorney's fees.

d. On COUNT IV, MAGNUSON MOSS WARRANTY ACT ("MMWA"), judgment against Defendant, actual damages, reasonable attorney's fees, costs and expenses, and declaratory judgment that Defendant has violated the MMWA;

e. On COUNT V, FRAUD, judgment against Defendant, actual damages, punitive damages, costs and reasonable attorney's fees;

f. On COUNT VI, NYGBL § 349, judgment against Defendant, injunctive relief, actual damages, three times the actual damages up to $1,000, punitive damages, costs and reasonable attorney's fees, declaratory judgment that Defendant has engaged in deceptive conduct, and such other or further relief as the Court deems appropriate;

g. On COUNT VII, NYGBL § 350, judgment against Defendant, injunctive relief, actual damages, three times the actual damages up to $10,000, punitive damages, costs and reasonable attorney's fees pursuant to NYGBL § 350(e), declaratory judgment that Defendant has engaged in false advertising and such other or further relief as the Court deems appropriate;

h. On COUNT VIII, BREACH OF CONTRACT, actual damages, costs and disbursements; and

Such other and further relief as law or equity may provide.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury as to all issues so triable.

Dated: April 24th, 2015
Pleasantville, New York

Respectfully Submitted,

_____
Daniel A. Schlanger, Esq.
Schlanger & Schlanger, LLP
*Attorneys for Plaintiff*
343 Manville Road
Pleasantville, New York 10570
T: 914-946-1981, ext. 101
F: 914-946-2930
daniel.schlanger@schlangerlegal.com